**HCBECK, LTD., Petitioner,**

v.

**Charles RICE, Respondent.**

No. 06–0418.

Supreme Court of Texas.

Argued Oct. 18, 2007.

Decided April 3, 2009.

Rehearing Denied June 5, 2009.

Peter Martin, Martin Mason Stutz, David R. Weiner, Glast, Phillips, & Murray, P.C., Dallas, for Petitioner.

Clifford B. Rodgers, The Rodgers Law Firm, Paul Boudloche, Mason & Boudloche, Fort Worth, for Respondent.

Kelly Susan Shoulders, Cokinos Bosien & Young, Arlington, Lin Hughes, McGinnis Lochridge & Kilgore, LLP, Austin, Di-

ana Panian Larson, Gardere Wynne Sewell, LLP, Richard Russell Hollenbeck, Wright Brown & Close, LLP, Houston, Fred D. Raschke, Texas Association of Defense Counsel, Austin, for amici curiae.

Justice GREEN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, and Justice BRISTER joined, and in Parts I, II, III, IV, V, and VII of which Justice WILLETT joined.

The purpose of the Texas Workers' Compensation Act is to provide employees with certainty that their medical bills and lost wages will be covered if they are injured. An employee benefits from workers' compensation insurance because it saves the time and litigation expense inherent in proving fault in a common law tort claim. But a subscribing employer also receives a benefit because it is then entitled to assert the statutory exclusive remedy defense against the tort claims of its employees for job related injuries. This exclusive remedy defense provided to subscribing employers is also afforded to a general contractor if, pursuant to a written agreement, it "provides" workers' compensation insurance coverage to the subcontractor and its employees. See TEX. LAB. CODE §§ 406.123(a), 408.001(a).

In this case, we consider the extent to which a general contractor must "provide" workers' compensation insurance under the Act to qualify for statutory employer status and the resulting immunity from the work-related claims of a subcontractor's employees. See TEX. LAB.CODE §§ 406.123(a), 408.001(a). The court of appeals held that a general contractor does not "provide" coverage in the manner contemplated by section 406.123(a) when its written agreement with the subcontractor requires only that the subcontractor enroll in the site owner's workers' compensation

insurance plan. 284 S.W.3d 361. We disagree. A general workplace insurance plan that binds a general contractor to provide workers' compensation insurance for its subcontractors and its subcontractors' employees achieves the Legislature's objective to ensure that the subcontractors' employees receive the benefit of workers' compensation insurance. Accordingly, we reverse the court of appeals' judgment.

I

FMR Texas Ltd. (FMR) contracted with HCBeck, Ltd. to construct an office campus on FMR's property. One of the features of this contract (the Construction Management Agreement, or the Agreement) was a workers' compensation insurance plan provided by FMR that covered the work site. The Agreement required this insurance plan, part of an owner controlled insurance program (OCIP), together with its corresponding OCIP Handbook, to be incorporated into all construction contracts entered into by HCBeck with any subcontractors. The Agreement described the manner in which FMR would provide insurance on the project:

> Prior to commencement of the Work, the Owner [FMR], at its option and cost, may secure and thereafter, except as otherwise provided herein, maintain at all times during the performance of this Agreement [workers' compensation insurance] ... with the Owner, the Construction Manager [HCBeck], subcontractors, and such other persons or interests as the owner may name as insured parties....

HCBeck and all subcontractors working on the project were required to enroll in the OCIP. As each contractor enrolled in the OCIP, FMR's insurance representative would designate the contractor "insured" for workers' compensation and other insur-

ance coverage, and an individual policy would be issued in the enrolled contractor's name. The Agreement permitted FMR to terminate or modify the OCIP at any time. But in the event FMR decided to terminate the OCIP, an alternate insurance provision in the Agreement required HCBeck to secure, at FMR's cost, other insurance covering itself and all subcontractors and employees at the same level as the workers' compensation coverage required in the OCIP.

Pursuant to the terms of the OCIP, FMR purchased workers' compensation insurance to cover the construction project and paid the premiums. Meanwhile, HCBeck entered into a subcontract with Haley Greer. The subcontract recognized that the project was covered by FMR's OCIP and further incorporated the insurance provisions contained in FMR's original contract with HCBeck. As mandated by the original contract, the subcontract required that Haley Greer apply for and enroll in FMR's OCIP. Haley Greer then enrolled in the OCIP, and a separate workers' compensation insurance policy was issued in Haley Greer's name.

Charles Rice, Haley Greer's employee, was injured while working on the construction project. Rice made claim upon and received workers' compensation benefits under the policy issued to Haley Greer pursuant to FMR's OCIP. He then filed a negligence suit against HCBeck. HCBeck moved for summary judgment claiming that its original contract with FMR specified that FMR's OCIP "shall" apply to all work at the project performed by HCBeck *and subcontractors* and, but for HCBeck's subcontract with Haley Greer, Rice would not be working on a project that contractually provided workers' compensation insurance covering Haley Greer's employees. HCBeck therefore maintained that it "provided" workers' compensation insurance to

Haley Greer as permitted by section 406.123(a) of the Act, and consequently was a statutory employer entitled to immunity from common law liability claims brought by Haley Greer's employees. *See* TEX. LAB.CODE § 406.123(e). HCBeck argued that Rice's exclusive remedy should be the workers' compensation benefits already received. *See id.* § 408.001(a). Rice, on the other hand, contended that the subcontract between HCBeck and Haley Greer obligated Haley Greer—not HCBeck—to provide its own coverage in the event that FMR terminated its OCIP. Since the workers' compensation insurance for Haley Greer's employees came at no cost to HCBeck, Rice argued that HCBeck did not "provide" insurance and was therefore not qualified under the Act as a statutory employer entitled to the exclusive remedy defense.

The trial court granted HCBeck's motion for summary judgment and denied Rice's reciprocal cross-motion for partial summary judgment. The court of appeals, however, held that "HCBeck's contract with Haley Greer—which simply incorporated FMR's OCIP into the subcontract under the direct order of FMR in its contract with HCBeck—is insufficient to constitute 'providing' workers' compensation insurance to Haley Greer." 284 S.W.3d at 384, 2006 WL 908761 at *4. HCBeck petitioned this Court on the question of whether, through its contractual arrangements with FMR and Haley Greer, it "provided" insurance to Haley Greer so as to qualify for immunity from common law liability claims. *See* TEX. LAB.CODE §§ 406.123(a), 408.001(a). We hold that HCBeck "provides" workers' compensation insurance under the Act because the insurance plan incorporated into both its upstream contract with FMR and its downstream subcontract with Haley Greer included workers' compensation coverage to Haley Greer's employees, and because the con-

tracts specify that HCBeck is ultimately responsible for obtaining alternate workers' compensation insurance in the event FMR terminated the OCIP. Accordingly, we conclude that HCBeck is Rice's statutory employer under section 406.123(e), and Rice's exclusive remedy is the workers' compensation benefits he has already received. *Id.* § 408.001(a).

## II

■■■ We review a trial court's summary judgment *de novo. Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). When, as here, both parties file a motion for summary judgment with the trial court, and one is granted and one is denied, the reviewing court determines all questions presented and renders the judgment that should have been rendered by the trial court. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004). Statutory construction is a legal question, which is reviewed *de novo* to ascertain and give effect to the Legislature's intent. *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 683 (Tex.2007). To discern that intent, we must begin with the "plain and common meaning of the statute's words." *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex. 2004). We also consider the objective the Legislature sought to achieve through the statute, as well as the consequences of a particular construction. *Id.; see also* Tex. Gov't Code § 311.023(1), (5).

## III

■■■ Under the Workers' Compensation Act, a "general contractor and a subcontractor may enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor." Tex. Lab. Code § 406.123(a). If the general contractor "provides" workers' compensation insurance, it becomes a statutory employer of the subcontractor's employees. *See id.* § 406.123(e) ("An agreement under this section makes the general contractor the employer of the subcontractor and the subcontractor's employees...."). Such an employer is immune from claims brought by a subcontractor's employee because the employee's exclusive remedy is his workers' compensation benefits. *Id.* § 408.001(a). It is undisputed that HCBeck is a general contractor. *See id.* § 406.121(1) (defining a general contractor as "a person who undertakes to procure the performance of work or a service, either separately or through the use of subcontractors"). Thus, the only question is whether the agreement between this general contractor and this subcontractor "provides" workers' compensation in a manner that makes HCBeck a statutory employer immune from liability under section 408.001(a).

The OCIP administered and paid for by FMR provided workers' compensation insurance coverage to all contractors and their employees working at FMR's job site. Rice claims HCBeck does not qualify as a statutory employer because, by the terms of the subcontract between HCBeck and Haley Greer, HCBeck was never obligated to provide workers' compensation insurance coverage to Haley Greer or its employees in the event FMR opted to terminate the OCIP. Both the original FMR/HCBeck contract and the HCBeck/Haley Greer subcontract state that FMR may terminate its OCIP at any time, but in that event, the contractors must obtain "alternate insurance." As between the general contract and the subcontract, the alternate insurance provisions are slightly different, but they outline the manner in which employees are to be covered if FMR decided to terminate the

OCIP. Rice points to the alternate insurance paragraph in the HCBeck/Haley Greer subcontract to show that HCBeck was never actually required to provide workers' compensation coverage to Haley Greer and its employees. The paragraph states:

ALTERNATE INSURANCE: The Owner [FMR] is not required to furnish the OCIP. If [FMR] elects to terminate the OCIP at any time, [FMR] will give subcontractor written notice. In the event of OCIP termination, Subcontractor and lower-tier subcontractors will be required to provide Alternate Insurance. Alternate Insurance is the coverage required by the [FMR/HCBeck] Contract Documents if the OCIP is not in force or does not apply.

Rice argues that, if the OCIP is terminated, this provision places the obligation of obtaining workers' compensation insurance for his benefit on his own employer, Haley Greer, and not HCBeck. But although such an interpretation could be gleaned from the paragraph if its third sentence is considered in isolation, the last sentence specifically requires the parties to refer to the FMR/HCBeck contract documents "if the OCIP is not in force or does not apply." That alternate insurance paragraph states:

If [FMR] elects to exclude this Agreement, or any portion thereof, from the OCIP or for any reason [FMR] is unable or unwilling to furnish [the OCIP] ... the Construction Manager shall secure such insurance at the Owner's cost....

This paragraph makes it clear that HCBeck is contractually obligated to obtain the insurance to cover the employees on the job site because it specifies that HCBeck, who was identified in the contract as the Construction Manager, "shall" secure the alternate insurance. Moreover, the OCIP Handbook states that "Contractors will be required to provide on-site [i]nsurance" in the event of OCIP termination.[1] When read together, these provisions outline a contingency plan in the event FMR exercises its contractual right to opt out of its obligation to provide workers' compensation insurance coverage, and that plan charges HCBeck with the responsibility of providing alternate insurance, not Haley Greer.

The dissent contends that HCBeck did not "provide" workers' compensation because "HCBeck did not agree to procure workers' compensation insurance in force for Haley Greer, nor did it agree to pay or somehow obligate itself to pay the premiums, or otherwise assure the workers' compensation coverage Haley Greer had in effect when Rice was injured." 284 S.W.3d at 362. But HCBeck complied in all respects with the provision in the Act that expressly allows it to enter into a written agreement to provide workers' compensation insurance to its subcontractors and their employees. Tex. Lab.Code § 406.123(a). That provision does not require a general contractor to actually obtain the insurance, or even pay for it directly. The Act only requires that there be a written agreement to provide workers' compensation insurance coverage. *Id.* In this case, the coverage that was actually provided to Haley Greer by FMR under

---

**1.** The OCIP Handbook, prepared by an outside risk management firm to provide further clarification regarding FMR's OCIP, differentiates between contractors and subcontractors, stating that, "[i]f the [OCIP] is terminated or does not apply, Contractor [HCBeck] will be required to amend (and cause their Subcontractors [Haley Greer] to amend) their insurance policies to provide additional coverage...." This indicates that the higher-tier contractor has the ultimate obligation to ensure that the employees of the lower-tier subcontractors are covered.

the agreement was backed by HCBeck's specific obligation assuring that Haley Greer remained covered in the event FMR decided to discontinue its OCIP.

HCBeck's obligation is further strengthened by its own interest in maintaining its statutory defenses against claims by Haley Greer's employees. The dissent argues that contracting for coverage does not equate to "providing" because there is no assurance that the general contractor will not abandon its obligation and leave the employee at risk of uncovered injury. But there is no guarantee that any employer will provide workers' compensation for its employees. The law does not require it, although public policy strongly encourages it. Employers that elect to carry workers' compensation coverage more than likely do so because the Act includes incentives for employers who provide it for their employees. The most obvious incentive, of course, is that employers are immunized from negligence liability for workplace injuries to their employees. See id. § 408.001(a). But an employer is always free, for whatever reason, to discontinue workers' compensation insurance. See id. § 406.005 ("An employer shall notify each employee as provided by this section whether or not the employer has workers' compensation insurance coverage.") (emphasis added). When that happens, the employer loses its exclusive remedy defense. The same result applies to the general contractor who has, pursuant to a written agreement, purchased a workers' compensation insurance policy covering its subcontractors and its subcontractors' employees. When it does so, the general contractor becomes the statutory employer of its subcontractor's employees, and is thus entitled to the benefits conferred on employers by the Act. See id. § 406.123(e). But a general contractor who makes such an agreement is no more required to continue providing workers'

compensation insurance than is FMR, or HCBeck, or Haley Greer in this case. The general contractor workers' compensation insurance plan simply offers certain benefits to parties who seek its advantages, but which benefits the parties may elect to forego. We conclude that HCBeck provided workers' compensation insurance to Haley Greer and its employees by way of FMR's written OCIP.

IV

In a variation of the dissent's position that HCBeck has not sufficiently involved itself in the actual purchase of Haley Greer's workers' compensation insurance to gain any advantage by it, the court of appeals concluded that HCBeck did not "provide" workers' compensation because, it says, the subcontract called for Haley Greer to obtain its own alternate insurance if FMR terminated the OCIP. 284 S.W.3d at 384, 2006 WL 908761 at *4,. It is true that if the OCIP was terminated, and HCBeck failed to obtain alternate workers' compensation insurance in its place, Haley Greer would have had to obtain workers' compensation insurance on its own in order to cover its employees. But the fear that an employee like Charles Rice might then be left uninsured by the failure of HCBeck to obtain workers' compensation insurance for Haley Greer as it had promised is a concern that would exist whether or not there was an OCIP or other written agreement to provide coverage. Even if Haley Greer had no workers' compensation insurance, Rice would not be without a remedy. He would have the right to sue FMR, Haley Greer and HCBeck in tort. But the scenario the court of appeals lays out never happened. In reality, Haley Greer was covered by workers' compensation insurance and Rice collected workers' compensation benefits from FMR's OCIP. But the court of appeals held that, on the

mere possibility that Haley Greer *might* have had to secure alternate insurance on its own if the OCIP was terminated, HCBeck should not be permitted the benefit of statutory employer status under the Act. 284 S.W.3d at 384, 2006 WL 908761 at *4. We conclude, however, that HCBeck would still qualify as a statutory employer because it "provided" workers' compensation insurance by virtue of its written agreement to either buy the insurance itself, or compensate Haley Greer for any "insurance premiums ... and all things necessary for the complete performance of the Work ... includ[ing] all other expenses and costs required to completely perform the Work in accordance with the Contract Documents." This defined "Subcontract Amount," found in HCBeck's contract with Haley Greer, ensures that Haley Greer will never bear the financial obligation of the alternate insurance. Whether or not HCBeck can ultimately recover that expense from FMR is irrelevant: what matters is that HCBeck is contractually bound to both parties to provide alternate insurance, and also financially bound to Haley Greer to pay even if it does not make the purchase itself. All of these steps serve as ample evidence that HCBeck goes beyond merely "requiring" enrollment in the OCIP. Moreover, this evidence negates the court of appeals' conclusion that there is no evidence HCBeck would provide Haley Greer with alternate insurance upon OCIP termination.

## V

The dissent would hold that a general contractor "provides" insurance if the contractor "puts something in the pot," or "contributes something of value for statutory immunity." 284 S.W.3d at 364. Specifically, the dissent would require that the general contractor "assure (1) the subcontractor is insured, and (2) the insurance will not lapse without the contractor allow-ing it to do so." *Id.* But HCBeck meets this test. HCBeck has satisfied the first prong because the HCBeck/Haley Greer subcontract covers Haley Greer with its own insurance policy via FMR's OCIP. Without HCBeck acting as a "conduit," as the dissent says, Haley Greer may not have been able to qualify for the project. Indeed, an OCIP helps makes insurance available to subcontractors, as the wider availability of insurance under an OCIP enhances the use of smaller contractors on projects. *See* Jacqueline P. Sirany & James Duffy O'Connor, *Controlled Construction Insurance Programs: Putting a Ribbon on Wrap–Ups*, 22 WTR CONSTR. LAW 30, 30 n. 3 (2002). But HCBeck does not stop at simply requiring Haley Greer to enroll in the OCIP—it also meets the second prong of the dissent's test. HCBeck agrees that it "shall" secure workers' compensation insurance if FMR's OCIP is no longer in place. The dissent claims that HCBeck does not adequately "assure" coverage remains in place by taking such actions as directly paying or guaranteeing payment of the premium, 284 S.W.3d at 355, but we think HCBeck does, in effect, act as guaranty to the policy premium by virtue of the "Subcontract Amount" in the contract that it has agreed to pay Haley Greer for the entire project. No matter who secures the workers' compensation upon OCIP termination—whether it be HCBeck *or* Haley Greer—that "Subcontract Amount" provision guarantees that HCBeck will pay the premiums and, thus, "put something in the pot." The onus of ensuring the insurance will not lapse is placed on HCBeck, just as the dissent would require.

## VI

The point of disagreement lies between two plausible interpretations of the term "provide." One plausible interpretation is

that the Legislature must have intended to exclude from statutory employer status the "conduit" between the owner-subscriber and the subcontractor. Another interpretation is that the Legislature must have contemplated the scenario in which the "conduit," itself, "provides" the workers' compensation by connecting the subcontractor to the monied party most able to pay. If we assume that both of these interpretations are reasonable, we are guided by the following aid to statutory construction:

> In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision.

TEX. GOV'T CODE § 311.023; *see also id.* § 312.005 ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy."). Consideration of these factors leads to the conclusion that the "old law, the evil, and the remedy" is best served by adopting the latter, inclusive, interpretation of the statute. *See id.* § 312.005.

First, the "object sought to be attained" has always been simple: to ensure coverage of subcontractors and their employees. *See* Act of May 28, 1983, 68th Leg., R.S., ch. 950, 1983 Tex. Gen. Laws 5210, 5210 (captioning the legislation as "relating to workers' compensation insurance coverage of subcontractors"). In this case, all of the parties agree that Rice was, in fact, insured when he was injured. The dissent

agrees that "this matter should be determined by what actually happened, not what might have happened." 284 S.W.3d at 363. If that is true, then the inquiry might properly end with the fact that no contingency plan for alternate insurance needed to be activated because FMR's OCIP was in place with all premiums paid up at the time that Rice was injured. Rice collected benefits from that very policy. Indeed, it is the dissent's view that rests solely on what might happen: *if* FMR's OCIP terminated, and *if* HCBeck then failed to purchase coverage for Haley Greer, and *if* Haley Greer did not purchase alternate coverage on its own, *then* Rice would be left uncovered. The "object sought to be attained" is best achieved through the use of an OCIP which provides a greater degree of certainty that a subcontractor's employee will be covered by workers' compensation insurance. *See* Sirany, *supra,* at 30 (noting one benefit of an OCIP as "improved insurance coverages").

Second, we consider the legislative history and the circumstances under which the statute was enacted. TEX. GOV'T CODE § 311.023. For almost one hundred years, the Act has contemplated that subcontractors can be covered by workers' compensation insurance purchased by others. In 1917, the Act included a provision that was designed to prevent subscribers from escaping liability by hiring subcontractors to perform the same work:

> If any subscriber to this Act with the purpose and intention of avoiding any liability imposed by the terms of the Act sublets the whole or any part of the work to be performed or done by said subscriber to any sub-contractor, then in the event any employe[e] of such sub-contractor sustains an injury in the course of his employment he shall be deemed to be and taken for all purposes

of this Act to be the employe[e] of the subscriber, and in addition thereto such employe[e] shall have an independent right of action against such sub-contractor, which shall in no way be affected by any compensation to be received by him under the terms and provisions of this Act.

Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part II, sec. 6, 1917 Tex. Gen. Laws 269, 284–85. By using of the term, "subscriber," the Legislature clearly intended that statutory employer status could only be claimed by one who purchased the workers' compensation policy. But when the Legislature enacted the written agreement provision in 1983, it kept the above provision and added three others: (a) the written agreement provision itself; (b) a definition for subcontractor; and (c) a definition for prime contractor. *Id.* The dissent urges a throwback interpretation—that one must essentially be a purchaser; i.e., a subscriber, to claim the statutory employer benefit. But this interpretation ignores the fact that the Legislature added the "prime contractor" provision, yet kept the term "subscriber" in the very same act. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(a), 1983 Tex. Gen. Laws 5210, 5210. With regard to the written agreement section specifically, the Legislature chose to use the term, "prime contractor," as opposed to "subscriber:"

> A subcontractor and prime contractor may make a written contract whereby the prime contractor will provide workers' compensation benefits to the subcontractor and to employees of the subcontractor.... [T]he contract may provide that the actual premiums (based on payroll) paid or incurred by the prime contractor for workers' compensation insurance coverage for the sub-contractor and employees of the subcontractor may be deducted from the contract price or any other monies owed to the sub-contractor by the prime contractor. In any such contract, the subcontractor and his employees shall be considered employees of the prime contractor only for purposes of the workers' compensation laws of this state ... and for no other purpose.

Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(c), (d), 1983 Tex. Gen. Laws 5210, 5210–11. It is significant that the Legislature did not specify that only "subscribers" could enter into written agreements to provide workers' compensation to subcontractors; instead, it added a new term, "prime contractor."[2] This indicates that the Legislature must have contemplated that the entity that has subscribed to the blanket policy, and the entity that "has undertaken to procure the performance of work or services," could be different. Other than allowing for the possibility that there could be an owner-subscriber and a separate general contractor, the Legislature made no further distinctions between the two, for it would be equally bad for the general contractor to leave the subcontractor's employees without coverage as it would for the owner who purchases the OCIP. *See Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433 (Tex.2009). For if no policy is in place, then neither the owner nor the general contractor would qualify as a statutory employer entitled to the exclusive rem-

---

**2.** "Prime contractor" became "general contractor" in later revisions of the Act, but the definition remained virtually unchanged. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6(c), 1983 Tex. Gen. Laws 5210, 5210–11 *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05(a)(2), 1989 Tex. Gen. Laws 1, 15 (current version at Tex. Lab.Code § 406.121(1)).

edy defense. *See* Tex. Lab.Code § 406.123(a), (e).

Further, the second sentence of the written agreement provision allows the prime contractor to deduct the actual premiums from the subcontractor.[3] In this case, HCBeck contracted to pay for Haley Greer's insurance through its agreement to pay the "Subcontract Amount," as opposed to contractually deducting premiums from Haley Greer's subcontract as contemplated by the statute. But there is no real distinction between the two methods for paying the insurance premium—it is simply accounting. In either case, the reality is that HCBeck was actually paying for the workers' compensation insurance—further evidence that HCBeck has gone beyond merely "requiring" Haley Greer to enroll in FMR's OCIP.

Next, to determine intent, we look to "the common law or other or former statutory provisions, including laws on the same or similar subjects." Tex. Gov't Code § 311.023. We have previously expressed our understanding of the purpose behind the exclusive remedy defense:

> The workers' compensation act was adopted to provide prompt remuneration to employees who sustain injuries in the course and scope of their employment.... The act relieves employees of the burden of proving their employer's negligence, and instead provides timely compensation for injuries sustained on-the-job.... In exchange for this prompt recovery, the act prohibits an employee from seeking common-law remedies from his employer, as well as his employer's agents, servants, and employees, for personal injuries sustained

in the course and scope of his employment.

*Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 142 (Tex.2003) (quoting *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 206–07 (Tex.2000)). In the same case, we also recognized a "decided bias" *for* coverage, and we articulated a construction of the written agreement provision that mirrors the facts of this very case:

> [The written agreement] legislation was construed to mean that when a premises owner agree[s] to procure workers' compensation coverage for its general contractor and the general contractor's subcontractor, a negligence suit by the subcontractor's employee against both the general contractor and the subcontractor [is] barred by the exclusive remedy provision....

*Wingfoot*, 111 S.W.3d at 140, 142 (citing *Williams v. Brown & Root, Inc.*, 947 S.W.2d 673, 675–77 (Tex.App.-Texarkana 1997, no writ)). Furthermore, several of the courts of appeals have concluded that a general contractor "provides" workers' compensation insurance even if the premises owner pays for the policy. *See, e.g., Hunt Const. Group, Inc. v. Konecny,* —— S.W.3d ——, ——, 2008 WL 5102276, *6 (Tex.App.-Houston [1st Dist.] Dec. 4, 2008, no pet.) ("Had the Legislature intended for 'provide' to mean 'purchase,' it could simply have used the word 'purchase' instead."); *Funes v. Eldridge Elec. Co.*, 270 S.W.3d 666, 672 (Tex.App.-San Antonio 2008, no pet.) ("to hold that the general contractor did not 'provide' the insurance would preclude protection of the general contractor, whom the Legislature clearly intended to protect under subsections

---

**3.** The deduction sentence was recodified, finding its final place in section 406.123(d) of the Labor Code. Act of May 28, 1983, 68th Leg., R.S., ch. 950, § 1, sec. 6, 1983 Tex. Gen. Laws 5210, 5210–11, *amended by* Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 3.05, 1989 Tex. Gen. Laws 1, 15, *repealed by* Act of May 22, 1993, 73rd Leg., R.S., ch. 269, § 5, 1993 Tex. Gen. Laws 987, 1273 (current version at Tex Lab. Code § 406.123).

406.123(a) and (e)").[4] Although not binding on us, these interpretations are persuasive on the point that multi-tiered contractor relationships are prevalent throughout Texas, and that interpreting the statute in a way that favors blanket coverage to all workers on a site aligns more closely with the Legislature's "decided bias" for coverage. *Wingfoot*, 111 S.W.3d at 140; *see also Etie v. Walsh & Albert Co., Ltd.*, 135 S.W.3d 764, 768 (Tex. App.-Houston [1st Dist.] 2004, pet. denied). The OCIP, designed by FMR to assure that workers' compensation insurance coverage was provided to all the workers on its construction project—including employees of contractors and subcontractors—is consistent with our articulation of the intent and purpose of the workers' compensation statute.

Finally, we consider the consequences of a particular construction. TEX. GOV'T CODE § 311.023. Holding that HCBeck "provides" workers' compensation, even when it has not purchased the insurance directly, would allow multiple tiers of subcontractors to qualify as statutory employers entitled to the exclusive remedy defense. Such a scheme seems consistent with the benefits offered by controlled insurance programs, which are designed to minimize the risk that the subcontractors' employees will be left uncovered.[5] On the other hand, holding that HCBeck does not "provide" workers' compensation because it has not directly paid for or somehow guaranteed payment of the policy via a line of credit would thwart the usefulness of controlled insurance programs that allow the highest-tiered entity to ensure quality and uninterrupted coverage to the lowest-tiered employees.[6] It is not clear, either from the court of appeals' holding or the dissent, what kind of guarantee would be required of a general contractor to adequately "provide" workers' compensation insurance coverage to secure the exclusive remedy defense in the absence of directly obtaining and paying for workers' compensation coverage for its subcontractor's employees. But if actually buying workers'

---

**4.** Both of these cases attempt to distinguish the court of appeals' opinion in *Rice v. HCBeck* by pointing to the fact that the Haley Greer was not automatically enrolled in the OCIP, and that FMR was not contractually bound to continue the OCIP. *See Hunt*, ──── S.W.3d at ────, 2008 WL 5102276, at *7; *Funes*, 270 S.W.3d at 672. As the dissent has urged, we look at what did happen, not what might happen. 284 S.W.3d at 361. Just like the subcontractors in *Funes* and *Hunt*, Haley Greer did enroll in FMR's OCIP, and Charles Rice did collect workers' compensation benefits for his injury. Thus, because the *reality* of the facts in each case are the same, we think these distinctions do not make a difference.

**5.** The purchasing power of a large construction owner, accompanied by centralized coverage and increased economies of scale are all factors that make it *less* likely that an owner-subscriber's workers' compensation coverage would be terminated. *See generally* Sirany, *supra*, at 30–33 (discussing various benefits of OCIPs, including reduced costs,

certainty of protection, centralized management, and enhanced coverage).

**6.** As a matter of illustration, high courts from other states have highlighted the benefits of the kinds of controlled insurance programs that are prevalent throughout Texas. *See generally Indep. Ins. Agents of Okla., Inc. v. Okla. Tpk. Auth.*, 876 P.2d 675, 676 (Okla.1994) ("Not only is a typical OCIP designed to reduce the cost of insurance premiums, it allows for a coordinated risk management and safety program for workers and visitors to the construction site. An OCIP also provides for insurance premium rebates to the policy owner for good construction safety records."); *Amer. Protection Ins. Co. v. Acadia Ins. Co.*, 814 A.2d 989, 991 n. 1 (Me.2003) ("The State uses OCIPs to save costs, secure better coverage, and have better safety programs. If a construction project does not have an OCIP, then each contractor and subcontractor has to procure its own insurance and the higher cost of the insurance is passed on to the State.").

compensation insurance is the only approved method of availing oneself of an immunity defense, then it makes no sense that the Legislature would enact an insuring scheme designed to promote the coverage of the lowest-tiered employees, only to require, in the end, employers who want the immunity defense to purchase workers' compensation insurance policies on the same employees at the same work site. Such a scheme defeats the entire purpose of securing a blanket OCIP and results in duplicative coverage and inefficient use of resources.[7]

## VII

We conclude that the Texas workers' compensation insurance scheme, as enacted by the Legislature, was intended to make the exclusive remedy defense available to a general contractor who, by use of a written agreement with the owner and subcontractors, provides workers' compensation insurance coverage to its subcontractors and the subcontractors' employees. The OCIP in this case, established and paid for by FMR pursuant to its contract with HCBeck, qualifies under the Act as "providing" workers' compensation insurance to subcontractors in a manner that is consistent with section 406.123(a). HCBeck, having "provided" the coverage to Haley Greer and its employees by virtue of the OCIP, and having otherwise satisfied the Act's requirements to qualify as a statutory employer, should be afforded the Act's employer benefits; *i.e.*, the

exclusive remedy defense against Rice's negligence claims.

Accordingly, we reverse the court of appeals's judgment and render judgment in favor of HCBeck.

Justice JOHNSON filed a dissenting opinion, in which Justice MEDINA joined.

Justice O'NEILL did not participate in the decision.

Justice JOHNSON, joined by Justice MEDINA, dissenting.

The workers' compensation system is bottomed on a voluntary trade. Employers provide workers' compensation insurance coverage in exchange for statutory immunity from suit by employees injured on the job. Employees accept workers' compensation insurance coverage in exchange for releasing their common law rights to sue the employer for injuries on the job. In *Texas Workers' Compensation Commission v. Garcia*, we described the exchange when considering a challenge to the constitutionality of the Texas Workers' Compensation Act (TWCA):

> [T]he Act—carrying forward the general scheme of the former act—provides benefits to injured workers without the necessity of proving negligence and without regard to the employer's potential defenses. In exchange, the benefits are more limited than the actual damages recoverable at common law. We believe this quid pro quo, which produces a more limited but more certain recovery, renders the Act an adequate substitute

---

7. To rule as the dissent suggests would likely do away with OCIPs in Texas, along with the benefits they provide to many large-scale developers. For example, the University of Texas System operates a blanket Rolling Owner Controlled Insurance Program, and since its inception, the ROCIP has enrolled over 4,800 contractors and over $3 billion in construc-

tion projects. The System has reported that the impact of its ROCIP program has amounted to $8,800,945. THE UNIV. OF TEXAS SYS., OFFICE OF RISK MGMT., RISK MANAGEMENT ANNUAL REPORT 5 (2007), *available at* h ttp://www. utsystem.edu/orm/reports/annualreport_2007. pdf.

for purposes of the open courts guarantee.

893 S.W.2d 504, 521 (Tex.1995).

Today the Court says "[a] general workplace insurance plan that binds a general contractor to provide workers' compensation insurance for its subcontractors and its subcontractors' employees achieves the Legislature's objective to ensure that subcontractors' employees receive the benefit of workers' compensation insurance." 284 S.W.3d 349, 350. It also says HCBeck qualifies as a statutory employer because its subcontract with Haley Greer incorporated the general workplace insurance plan. *Id.* at 350. The Court's decision extends statutory immunity to HCBeck without requiring a corresponding substantive quid pro quo from it as was intended by the Legislature. The decision enlarges the number of entities that can claim that which an employee ostensibly provides by releasing his or her common law right to sue—immunity from suit—by merely *contracting* for someone else such as the subcontractor or the owner of a project to secure and maintain insurance for the subcontractor. All HCBeck did here was facilitate communications between FMR and Haley Greer and agree that HCBeck might in the future provide workers' compensation insurance for Haley Greer. That goes beyond what the Legislature intended.[1] Accordingly, I dissent.

Pursuant to its contract with HCBeck, FMR elected to provide insurance through its OCIP and arranged for an agency to secure individual insurance policies for contractors and subcontractors, including both HCBeck and Haley Greer. The insurance covered only on-site construction activities at FMR's office campus in Westlake. The contractors and subcontractors were contractually required to maintain and furnish proof of separate insurance for their off-site activities. As to the OCIP insurance, FMR paid the premiums. Each contractor and subcontractor adjusted its individual contract price to reflect the premiums FMR paid for the coverage of the individual contractor or subcontractor. Under HCBeck's agreement with FMR, if FMR elected not to provide insurance via an OCIP, then "upon thirty (30) days written notice from the Owner," HCBeck was required to perform the actions FMR actually performed in this case: securing insurers to write coverage for the contractors' on-site Westlake construction activities, paying for the coverage, and then adjusting contract prices of the contractors, if necessary, to reflect the insurance premiums.[2] But because FMR both secured Haley Greer's insurance and paid for it, HCBeck did neither as to the workers' compensation policy in effect when Rice was injured. Nor had HCBeck undertaken any obligation or commitment that assured the coverage was in place. HCBeck's substantive function as to the insurance was (1) contractually requiring the subcontractor to obtain workers' compensation insurance through FMR's plan, and (2) agreeing that it might in the future

---

1. The issue of whether HCBeck has immunity on some basis other than as an employer is not before us. *See* Tex. Lab.Code § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.")

2. Rice disputes this point and asserts that the agreements required Haley Greer to provide its own insurance if FMR did not. Because I would reach the same conclusion regardless of whether HCBeck or Haley Greer was required to provide the insurance if FMR did not, I assume the documents required HCBeck to do so.

actually secure and pay for coverage if FMR did not.

Under HCBeck's subcontract with Haley Greer, HCBeck did not agree to procure the workers' compensation insurance in force for Haley Greer, nor did it agree to pay or somehow obligate itself to pay the premiums, or otherwise assure the workers' compensation coverage Haley Greer had in effect when Rice was injured. Haley Greer's subcontract incorporated the contract between FMR and HCBeck. In that contract, HCBeck only agreed to secure and pay for insurance if FMR notified HCBeck that FMR was unable or unwilling to furnish the coverage under an OCIP. The latter contingency did not occur before Rice was injured.

Citing section 406.123(a) of the TWCA, the Court says that HCBeck "complied in all respects with the provision in the Act that expressly allows it to enter into a written agreement to provide workers' compensation insurance to its subcontractors and their employees." —— S.W.3d at ——. The Court is wrong. Section 406.123 states that a general contractor and a subcontractor may enter into a written agreement under which the general contractor *provides* workers' compensation insurance for the subcontractor and its employees, not under which it agrees *to provide* the insurance at some point. Tex. Lab.Code § 406.123(a). The Act must speak of insurance in effect at the time of an employee's injury as opposed to some possible future date; if not, there would be no argument about immunity because there would be no injured employee suing the general contractor. The statute is clear. If the general contractor and subcontractor enter into a contract under which the general contractor provides the insurance, not just promises to provide it at some future time, then the general contractor is classified as the employer of the

subcontractor and the subcontractor's employees for purposes of the TWCA:

§ 406.123. Election to Provide Coverage; Administrative Violation

(a) A general contractor and a subcontractor may enter into a written agreement under which the general contractor *provides* workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor.

. . . .

(d) If a general contractor . . . elects to *provide* coverage under Subsection (a) . . . the actual premiums, based on payroll, *that are paid or incurred* by the general contractor or motor carrier for the coverage may be deducted from the contract price or other amount owed to the subcontractor. . . .

(e) An agreement under this section makes the general contractor the employer of the subcontractor and the subcontractor's employees only for purposes of the workers' compensation laws of this state.

(f) A general contractor shall file a copy of an agreement entered into under this section with the general contractor's workers' compensation insurance carrier not later than the 10th day after the date on which the contract is executed. If the general contractor is a certified self-insurer, the copy must be filed with the [Workers' Compensation] division.

(g) A general contractor who enters into an agreement with a subcontractor under this section commits an administrative violation if the contractor fails to file a copy of the agreement as required by Subsection (f).

Tex. Lab.Code § 406.123 (emphasis added).

In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the statutory language. *City*

*of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex.2008). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired; otherwise, we construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or such a construction leads to absurd results. *Id.* at 625–26; *see* TEX. GOV'T CODE § 311.011.

The Legislature did not define "provides" or "provide" as those words are used in section 406.123. Looking to the common meaning of "provide," we find the definition includes to "supply," "furnish," or "make available." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1556 (1996); *see* TEX. GOV'T CODE § 311.011(a). The "make available" part of the definition is of little applicability when the key to obtaining statutory employer status is a quid pro quo. *See Garcia,* 893 S.W.2d at 521. To "make available" the insurance, all a general contractor would have to do is refer the subcontractor to an insurer or agent who would write the coverage or require the subcontractor to apply for insurance with an owner such as FMR. The general contractor does not trade anything of value in such a situation. Section 406.123 does not express Legislative intent to change the fundamental quid pro quo concept underlying relationships between workers and those who could be subject to common law liability for on-the-job injuries to workers. *See* TEX. LAB.CODE § 406.123. Therefore, the "supply" or "furnish" part of the definition is applicable here. The two words essentially are the same: "supply" means to "furnish or provide with what is lacking or requisite," WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1912 (1996), while "furnish" means to "provide or supply" with something. *Id.* at 777.

The Court views HCBeck as having provided, that is, supplied or furnished, Haley Greer's insurance by contractually requiring Haley Greer to participate in FMR's OCIP. For the same reasons expressed above as to making the insurance "available," even if HCBeck's actions fall within an expansive construction of supplying, furnishing, or providing the insurance, its actions do not warrant statutory employer status because HCBeck still did not contribute anything of value—a quid pro quo—to the trade Haley Greer's employees made for workers' compensation coverage. Moreover, HCBeck's actions simply do not equate to supplying or furnishing the insurance. By contractually requiring Haley Greer to enroll in the OCIP, HCBeck supplied or furnished Haley Greer with the opportunity and obligation to apply for insurance; it did not provide the insurance itself. FMR supplied or furnished the insurance when FMR secured the agency to place the insurance and paid the premiums. Absent payment of, or incurring liability for, premiums by FMR, the insurance that covered Rice when he was injured would not have gone into effect and been in place.

The parties, the Court, and I agree this matter should be determined by what actually happened, not what might have happened. As to what actually happened, HCBeck substantively functioned only as a conduit through which FMR's insurance requirements were communicated to and imposed on Haley Greer. Otherwise, HCBeck played no part in locating the agent who placed the insurance or in securing and making certain the insurance remained in effect. For a general contractor such as HCBeck to "provide" workers' compensation insurance to a subcontractor under section 406.123 and in exchange receive the significant benefit of statutory employer status, the Legislature surely intended that the general contractor must do more than communicate insurance requirements or contractually require other par-

ties to maintain the insurance in effect, even if the contract requires a subcontractor to enroll in a program in which the project owner contractually agrees to purchase the subcontractor's insurance.

The Court's opinion could be interpreted as allowing a general contractor to claim statutory employer status by agreeing in a subcontract to provide workers' compensation insurance, yet also requiring the subcontractor to provide coverage if the contractor does not. Then, so long as the subcontractor maintains coverage, the general contractor would have contributed nothing to the trade by the subcontractor's employees of their common law rights, yet may claim statutory immunity because it contractually "provided" the insurance. The Court's holding might even be interpreted as giving a general contractor statutory employer status if it contractually required a subcontractor to provide workers' compensation insurance on its own, so long as the subcontractor maintained coverage. Again, the general contractor would have exchanged nothing for the subcontractor's employees' release of their common law rights against the general contractor. Section 406.123 of the TWCA does not reflect legislative intent that general contractors should have statutory immunity when their involvement in assuring workers' compensation insurance coverage for the subcontractor and its employees is so minimal. *See* Tex. Lab.Code § 406.123. I would hold that in order for a general contractor to be afforded statutory employer status because it "provides" workers' compensation insurance to a subcontractor, the general contractor must be more substantively involved in securing and maintaining the subcontractor's workers' compensation insurance coverage than was HCBeck, and that contracting for another to place and maintain insurance, whether to be done in the present or the future, is not enough to qualify for the status.

I would hold that under section 406.123, a general contractor "provides" workers' compensation insurance if the general contractor "puts something in the pot," that is, if it contributes something of value for statutory immunity. It could do that by taking actions to assure (1) the subcontractor is insured, and (2) the insurance will not lapse without the contractor allowing it to do so. Such actions would equate to substantive involvement by the general contractor in obtaining and maintaining the subcontractor's insurance. But for the general contractor's actions to reach a level of substantive involvement warranting statutory employer status, coverage would have to actually be assured by the general contractor and not be dependent merely on the fulfillment of a contractual obligation or the payment of premiums by another party, such as a subcontractor that might be under financial pressure to save money by stopping payment of its insurance premiums or an owner that might run short of funds and stop paying insurance premiums. In other words, the general contractor would have to place itself in a position to have actual control over the workers' compensation insurance becoming effective and remaining in force.

There could be flexibility in how such substantive involvement requirements are met. For example, as to the first requirement referenced above, the statute specifically contemplates a situation in which the subcontractor's insurance is "provided" if a general contractor adds the subcontractor and its employees as insureds under the general contractor's workers' compensation policy. *See id.* § 406.123(f) (requiring a general contractor to file a copy of an agreement under section 406.123 with its workers' compensation carrier or, if self-insured, the Workers' Compensation Divi-

sion); *Id.* § 406.123(g) (making the failure to file a copy of the contract in accordance with subsection (f) an administrative violation). But the requirement might also be fulfilled by the general contractor requiring the subcontractor or its insurer to furnish a certificate of insured status from the insurance company, or a copy of a policy showing coverage for the job activities in question. As to the second referenced requirement, the essential element to keeping insurance in force is payment of premiums. That requirement is most clearly fulfilled when the general contractor is directly liable for the policy premiums so the insurer either receives premiums from the general contractor or the insurer has an unqualified guaranty from the general contractor that the premiums will be paid. *See, e.g., id.* § 406.123(d) (stating that a general contractor that provides coverage to a subcontractor under a written agreement to do so may deduct the actual premiums, based on payroll, that the general contractor pays or incurs for the coverage from amounts owed to the subcontractor). There are methods by which the general contractor could become directly liable for premiums and assure the insurance does not lapse other than by directly paying premiums—for example, by letter of credit that the insurer could draw against if premiums were not paid otherwise. It is worth noting here that section 406.123 does not specify who must finally absorb the subcontractor's premium cost. The statute authorizes premiums paid or incurred for a subcontractor's insurance to be deducted from amounts owed to the subcontractor. *Id.* But the statute does not preclude the owner from bearing the premium cost, as FMR did in this case. And clearly, the general contractor could absorb the cost without looking to any other party for reimbursement.

The Court says "the reality is that HCBeck was actually paying for the workers' compensation insurance" because HCBeck contracted to pay the "Subcontract Amount" that did not include premiums FMR paid for Haley Greer's insurance as opposed to contractually deducting the premiums from Haley Greer's subcontract. —— S.W.3d at ——. It concludes there is no real distinction between the two methods of paying the insurance premiums because it is "simply accounting." *Id.* at ——. In this case, though, the distinction matters. Insofar as the workers' compensation insurance that covered Rice, HCBeck was a bystander. It was an interested bystander to be sure; but it was a bystander. FMR bought and paid for Haley Greer's insurance. It received and checked Haley Greer's wage reports on which the compensation insurance premiums were calculated. It determined the amount by which Haley Greer's subcontract was adjusted for the premiums. And the money to pay Haley Greer's subcontract came from FMR. HCBeck did not actually pay Haley Greer's premiums, FMR did. HCBeck had no more involvement in "providing" the workers' compensation insurance covering Rice for his injury on FMR's Westlake job than it had in "providing" Haley Greer's workers' compensation insurance for off-site operations. In both instances HCBeck contractually required Haley Greer to have the insurance in place, but HCBeck neither secured placement of the insurance nor assured its being in force at the time of Rice's injury.

The question before us is not whether OCIPs are the best or most efficient and economical way to secure insurance—including workers' compensation insurance—for all workers on job sites. Nor is it how OCIPs interface with workers' compensation law. Those matters are significant, but they are more in the nature of policy issues better left to the Legislature to balance and address. The question be-

fore us is limited to whether under these particular circumstances the Legislature extended statutory immunity from suit by an injured worker—the major incentive for an employer to carry workers' compensation insurance—to an entity that is not the injured worker's direct employer. Under the Court's decision, that important inducement for carrying workers' compensation insurance is extended to HCBeck even though it did not substantively participate in the transaction that resulted in Rice being covered by workers' compensation insurance.

I would hold that HCBeck was not Rice's statutory employer. I would affirm the judgment of the court of appeals.

